.JUDGE PETERS
bblivbeed the opision oí? the doubt:
In May, 1866, H. Hardy, a resident of the county of Calloway — a farmer, merchant, and a dealer and speculator in tobacco — was indebted to various planters for their crops of tobacco, and to others on other accounts; his aggregate indebtedness being very large compared with the value of his estate and his means to discharge it.
A tobacco fair was held in Paducah on the 25th and 26th of May, 1866. According to previous arrangements, Hardy had been selected as one of the judges of articles to be exhibited at said fair; and publication of the time, place, and objects of the fair, with the names of the judges, had been made for reasonable and proper time before it came off. For days, and weeks, perhaps, previously, Hardy had expressed his intention to his associates and neighbors, and to some of his creditors, -to attend the fair.
On the morning of the 23d of May he set out for Paducah, distant forty-five miles from his home; anived in Benton, Marshall county, early in the forenoon, having *646 traveled to that place from home, a distance of eighteen or twenty miles, in about three hours, as he told Jones, a witness. He remained in Benton several hours — if on business, he failed to show it. He then left Benton, and went to Palma, eight miles on his way to Paducah; remained there with Mr. Wade, his brother-in-law, all night, and reached Paducah the next day, where the greater portion of the tobacco which he had purchased from the planters had been sent by him, to be sold during the fair, some of which arrived on the 23d, and the residue in a few days afterwards.
On the 29th of May he had not retured from the fair, and some of his creditors, on that day, instituted suits against him, with attachments, and during several other successive days other creditors brought their actions against him, with attachments, all of which were levied on the real and personal estate of said Hardy, or such of it as could be found in the counties of Calloway and Marshall.
Hardy returned home on the 7th of June, and, during the June term of the Calloway circuit court, which commenced the 11th of the month, he filed his affidavits in the several actions against him, controverting the grounds for suing out said attachments, and moved for their discharge ; but his motions were overruled, the actions having been previously consolidated. In some of the cases, summons were executed on Hardy in time for judgments at the June term; and in some of those in which process had not been executed, he entered his appearance; but as he put in no answer, and did not controvert the alleged indebtedness in said cases, personal judgments were rendered against him, and the attachments were sustained. Of so much of the judgments as sustained the attachments, Hardy and others complain, and seek a reversal *647 upon two grounds — First. “ That the affidavits upon which the attachments, or some of them, were founded, are defective and insufficient;” and, second. That the judgment sustaining them was not authorized by the evidence.
In Trabue, Davis Co. vs. Hardy, which was the first action brought in the list, the original grounds for the attachment stated in the petition are, that said “ H. Hardy has left the county of his residence to avoid the service of a summons, or so conceals himself that a. summons cannot be served on him.”
Here two grounds for an attachment are stated, either of which of itself, and independent of every and all others, would be sufficient; but it is insisted in an able brief by the learned counsel for appellants that an attachment has never been sustained by this court where two or more grounds therefor are set forth in the affidavit in the alternative; and the case of Shipp vs. Davis (Har., 65) is mainly relied upon as sustaining that position. That case, as the opinion shows, was decided upon the authority of the case of Cooper vs. Logan (Pr. Dec., 320).
The attachments in both of these cases were issued under the statute of 1796 (1st volume M. 4* Brown's Digest, p. 158), the 5th section of which provides, that it shall be lawful for any justice of the peace, upon complaint to him made by any person that his debtor is removing out of the county privately, or absconds and conceals himself so that the ordinary process of the law cannot be served upon him, to grant an attachment against the estate of such debtor. * * * * The grounds stated for the attachment in Shipp vs. Davis, supra, are, that “the said John Shipp hath privately removed himself out of the county, or so absconds and conceals himself that the ordinary process of the law cannot be served upon him.”
*648 It is true, that, according to the terms in which the opinion is expressed, the attachment was quashed, because the complaint was not positive, but in the alternative, in not alleging positively that the defendant was removing out of the county privately, or that he so absconded and concealed himself that the ordinary process of law could not be served on him.
It is important to observe that the first part of the complaint, or first ground of attachment in this case, was wholly insufficient to sustain such a proceeding; it was in the past tense. The allegation is, that the defendant hacl removed. In that condition of the debtor the statute did not apply; it only applied when he is removing — • the present tense; and this construction was given to it in Davis vs. Edwards (Har., 342), and in Kennedy vs. Dillon (1 A. K. Mar., 354). This objection, however, was not directly commented upon in Shipp vs. Davis, supra, if observed by the court; but in the case of Davis vs. Edwards, where the same defect in the complaint existed, the court said : “ The present attachment is in the alternative — the one case clearly without the provisions of the statute, and the other cannot be said to be within it.”
This defect in the statement of the complaint in Shipp vs. Davis may have escaped the attention of the court, as it was not commented on; but in Davis vs. Edwards it certainly did not, as appears from the quotation just made from the opinion in that case; and the language of the opinion authorizes the conclusion that the attachment was adjudged bad, on account of a substantial departure in the statement of the grounds for the attachment, rather than that the statement was made in the alternative. But be that as it may, it has not been directly decided in any of the cases referred to under the act of *649 1796, supra, that an attachment would not be sustained where the grounds therefor were set out in the very words of the statute, because the two grounds were stated in the alternative, and, therefore, cannot be said to be in conflict with “ Wood vs, Wells (2 Bush, 197,” as contended by counsel for appellants.
It seems to be conceded, that if the ruling of this court in the last named case is adhered to, upon a reconsideration thereof, the grounds for the attachments in the larger number of these consolidated cases must be adjudged sufficient.
A review of the questions decided in the last named case, and also in the case of Harrod vs. Orear, may be very proper, especially as distinguished counsel have expressed the opinion that the decisions in the two cases do not harmonize.
The affidavit for the attachment in the case of Harrod vs. Orear, contained the single ground set forth in subsection 7 of section 221, Civil Code, that the defendant had sold, conveyed, or otherwise disposed of his property, or suffered or permitted it to be sold, with the fraudulent intent to cheat, &c., &c.; and on the sufficiency of that affidavit the distinguished judge, who delivered the opinion of the court, said: “Although an affidavit presents several states of case in the alternative, either of which would be sufficient to sustain an attachment, yet as it was in the language of the Code itself, it must be deemed sufficient.” These alternative grounds, as before noticed, are all contained in sub-section 7; but if the grounds contained in the 8th sub-section, immediately following the seventh, in these words: “Or is about to sell, convey, or otherwise dispose of his property .with such intent,” had been inserted in the affidavit in addition to the. others, we cannot believe that a different opinion would have *650 been the result, and the affidavit held insufficient, solely because the grounds were separated into two sub-sections, instead of all being in one. And if this opinion is to be sustained because all the grounds stated in the affidavit are contained in the same paragraph or sub-division, then the cases decided under the act of 1796 are clearly wrong, because the two grounds on which attachments were allowed under that act were in the same sentence or paragraph, and the case of Harrod vs. Orear overrules them.
The affidavit in Wood vs. Wells, supra, embraced the grounds contained in the 7th and 8th sub-sections of section 221, Civil Code, stated in the alternative, and was decided to be sufficient on the authority of Harrod vs. Orear; and irow, after a review of the cases, we feel constrained to adhere to the decisions therein rendered as reasonable and consistent with the objects of the enactment. But the objection, if available, is only applicable to the cases of Trabue, Davis & Co. vs. Hardy; Curd's ex'r vs. Same, and of Bamberger, Bloom & Bamberger vs. Same. The grounds in all the other cases are stated positively. The affidavits, however, in all the cases, must be deemed sufficient, as held in the above cases.
The only remaining question is, does the evidence authorize the judgments sustaining the attachments?
Although Hardy was, at the time, heavily indebted, and his creditors importunate, still it was very natural that the fair at Paducah should attract the attention, and cause the attendance of purchasers of tobacco from different points, and he might, under such circumstances, consistently yith good faith and fair dealing, have taken his tobacco there as a place where he would find a readier sale at higher prices, owing to the number *651 of buyers and tbe probable competition among them, than could be realized in the county of his residence, or at his place of business. It might not only have been consistent with an honest purpose on the part of Hardy, but it would seem both judicious, and best for all parties concerned, that he should have transported his tobacco to that place, and have attended in person. His creditors so regarded it, for none of them brought suits, after he left home, until the 29th of May, giving him time, after the fair had closed, to return home. Going to Paducah and taking his tobacco there would not, of themselves, have been sufficient to fix an unlawful purpose or a fraudulent intent on Hardy.
Three principal reasons are assigned for his failure to return home at the close of the fair: 1. His great desire to make sale of his tobacco to enable him to pay those he owed for it. 2. His purpose to return with a stock of goods, which he was unable to procure in Paducah; and, 3. To effect a settlement with his partner Wade.
Rudolph proves he commenced negotiations with Hardy for the purchase of forty hogsheads of his tobacco on the 29th of May, which continued some ten days, at the close of which he purchased twenty-three hogsheads- of him at about three thousand five hundred dollars. Why these negotiations were kept open so long, or whether a sale could not have been consummated within a shorter period, are not explained by Rudolph nor any other witness; and from the reading of Rudolph’s deposition, it would appear that he and Hardy were engaged for ten days continuously in making the trade. But from other evidence it appears he left Paducah on the 30th of May to go to Mr. Wade’s, in Marshall county, with whom he had business as he said. He, however, did not reach Wade’s until about noon of the 31st of May, remained *652 there till next morning, eight or nine o’clock; vrent to T. L. Jones’s, about seven miles from Paducah, where he arrived about sun down; staid all night, and left next morning, the 2d of June, for Paducah. So that of the ten days which Rudolph says he and Hardy were engaged in making the trade for twenty-three hogsheads of tobacco, the latter was absent from the city the greater part of four, on business with Wade, which he proves was settled between noon of one day and eight or nine o’clock the next morning; but how long they were, in fact, engaged in the business, Wade was not asked, and did not state.
A. Johnson proves Hardy came to his house on the evening before the fair, and remained there until Wednesday morning afterwards. Jacobs, from whom he hired a horse to go to Wade’s, proves he left on the 30th of May. If Johnson is right in the day of- the week he left, he returned on Saturday; and Lee proves he went from Paducah to Evansville with Hardy, and returned with him, and that they left the former place on Sunday morning.
The sale to Rudolph was completed before he started to Evansville, and if it was commenced on the 29th of May, it could not have been on hand more than five or six days at most, nearly four of which Hardy was absent from the city.
But it is singular and significant that Hardy should have left the city at that time, when there was a prospect for a. sale of a large portion of his tobacco, a matter of very great importance to him. If his business wfith Wade was indispensable, admitting of no delay, he could have shown it to be so by Wade; but he failed not only to examine him on that point, and to give any explanation of the character of that business, and by his own 'conduct *653 showed that he did not deem it so important and pressing as to require his attention at that particular time.
He left home on the 23d, in time to have reached Wade’s that day, and settled his business with him; he, however, remained several hours in Benton, without having any business to detain him, as far as is shown in this record; then goes to Wade’s, and if anything was said by either of them on the subject of this business, except that Wade should go to Paducah during the fair to settle it, we are not informed; and that certainly was neither a suitable time nor place for such business, as it must have interfered with Hardy’s engagement as judge of the fair, or taken his attention from the more important matter of effecting sales. Why the business was not adjusted between them on the 23d and 24th of May, is not answered nor explained satisfactorily.
Moreover, why did he not go directly to Wade’s on the 30th from Paducah, if it was so necessary that this business should be attended to, and return as soon as it was completed? It is no excuse that he, on the 30th, went to visit his brother-in-law, Kuykendall. His business in Paducah was too important, and the demands of his creditors too pressing, to be neglected or postponed for the sake of a visit to a relative — a duty, if he felt it to be such, which he had neglected for about ten years before that particular time; and his conduct and delays, after he left Wade’s, indicated a disinclination to hasten his return to Paducah.
These, with other facts and circumstances which might be added but for an unwillingness to extend this opinion (already too long), induce this court to concur in opinion with the court below.
Wherefore, the judgment is affirmed.